UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

KAREN L. BURNETT,

     Plaintiff,

  -v-           5:10-CV-1336

DAMON CORP., previously d/b/a Damon
Motor Coach and n/k/a Thor Motor Coach,
Inc., a wholly-owned subsidiary of Thor
Industries, Inc.,

     Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

DAMON CORP., previously d/b/a Damon
Motor Coach and n/k/a Thor Motor Coach,
Inc., a wholly-owned subsidiary of Thor
Industries, Inc.,

     Third-Party Plaintiff,

  -v-

FLAGG ENTERPRISES, INC., d/b/a Flagship
RV's,

     Third-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:        OF COUNSEL:

LYNN LAW FIRM, LLP      MARTIN A. LYNN, ESQ.
Attorneys for Plaintiff Burnett
M&T Bank Building
101 South Salina Street
Suite 802
Syracuse, NY  13202

HANCOCK ESTABROOK, LLP
Attorneys for Damon Corp./Thor
1500 AXA Tower I
100 Madison Street
Syracuse, NY 13202

TIMOTHY P. MURPHY, ESQ.
JAMES P. YOUNGS, ESQ.
ZACHARY M. MATTISON, ESQ.

RUPP, BAASE, PFALZGRAF, CUNNINGHAM &
    COPPOLA, LLC
Attorneys for Flagg Enterprises, Inc.
424 Main Street
1600 Liberty Building
Buffalo, NY 14202

JEFFREY F. BAASE, ESQ.
R. ANTHONY RUPP, III, ESQ.

DAVID N. HURD
United States District Judge

## MEMORANDUM–DECISION and ORDER

## I. INTRODUCTION

On November 4, 2010, Karen L. Burnett ("plaintiff" or "Burnett")—a resident of Onondaga County, New York—initiated this action against defendant Damon Corp., now known as Thor Motor Coach, Inc. ("Thor"), a Delaware corporation that designs and manufactures recreational motor homes. Plaintiff filed an amended complaint on March 2, 2011, and asserts three state claims for strict products liability, negligence, and failure to warn arising from personal injuries allegedly caused by harmful mold that grew in her motor home.[1]

Thor subsequently filed a third-party complaint, and ultimately a second amended third-party complaint, against Flagg Enterprises, Inc. ("Flagg"), a Florida corporation that owns and operates several motor home dealerships in Florida. Thor alleges negligence on

---

[1] Subject matter jurisdiction is grounded in the complete diversity of the parties pursuant to 28 U.S.C. § 1332.

the part of Flagg and seeks contribution and/or indemnification from Flagg. Flagg filed a counterclaim against Thor for indemnification.

Thor has filed a motion seeking to preclude the testimony of plaintiff's experts and, in turn, for summary judgment on the three claims in the amended complaint. Plaintiff responded in opposition,[2] and Thor replied. Flagg has filed a motion for summary judgment with regard to Thor's second amended third-party complaint. Thor has responded in opposition, and Flagg replied. Oral argument was heard on June 14, 2013, in Utica, New York. Decision was reserved.

## II. __FACTUAL BACKGROUND__

Unless otherwise noted, the following facts are undisputed. Further factual allegations will be developed as needed in the discussion. Flagg was founded in 1998 by Gary and Lori Flagg and was an authorized distributor of Thor vehicles in Florida during the relevant time period. The Dealer Agreement that guided this business relationship contains an "Indemnification by Manufacturer" clause as well as an "Indemnification by Dealer" clause.[3]

---

[2] In her opposition papers, plaintiff notes: "Plaintiff's property damage claims for negligence/product liability are unopposed by any credible evidence and thus Plaintiff should be granted summary judgment on the property damage claim with the remaining issue being a trial on damages." Pl.'s Mem. Opp'n Summ. J. 23. However, plaintiff has not made a formal cross-motion for partial summary judgment, and her invitation to grant such relief sua sponte is declined.

[3] The Indemnification by Manufacturer clause provides:
>  Manufacturer shall indemnify and hold Dealer harmless against claims, causes of action, damages, costs and expenses, including reasonable attorney's fees and court costs, concerning bodily injury or property damage (including damage to the product) claimed to have been caused by an alleged defect in the design, manufacture or assembly of a product produced by Manufacturer, provided, however, that any claimed defect in manufacture or assembly was not such as should have been detected by Dealer in a reasonable inspection of the product, when performing an acceptance or pre-delivery inspection for the product or otherwise.

Baase Decl., Ex. H, ¶ 8.1, ECF No. 39-10. The Indemnification by Dealer clause provides in pertinent part:
>  Dealer shall indemnify and hold Manufacturer harmless against claims, causes of action, damages, costs and expenses, including reasonable attorneys' fees and court costs,

(continued...)

On December 16, 2005, Burnett purchased a Thor Daybreak recreational vehicle ("the RV") from a Flagg dealership in Florida. Thor manufactured the RV in August 2004, and it had over 1000 miles on the odometer when plaintiff purchased it. She alleges that the RV was constructed using organic, untreated material that is susceptible to mold growth. Thor conducted a "rain booth" test on the RV before shipping it to Flagg's dealership. This test consists of placing the vehicle inside a large booth and spraying water on it while a Thor employee performs a visual inspection for leaks inside the RV. This is completed after all of the fixtures, carpeting, and furniture have been installed inside the vehicle. Plaintiff maintains that several lines of Thor motor homes, including the Daybreak, the Intruder, and the Challenger, all experienced water leakage and mold growth of which Thor was aware. According to Lori Flagg, all motor homes are visually inspected after delivery to the Flagg dealership.

Burnett owned two similar motor homes in the past and was aware that some parts of such a vehicle may leak. The RV she purchased on December 16 came with an owner's manual that contained notices regarding warranties and outlined recommended maintenance intervals. Notices were also posted on different areas of the RV itself. The RV was covered by a limited warranty that lasted twelve months or 12,000 miles, whichever occurred first.[4]

Within a few months after purchasing the RV, Burnett noticed that the driver-side

_____

(...continued)
    concerning:
    (i) Dealer's alleged failure to perform, or negligent performance of (i.) the service obligations assumed by it pursuant to this Agreement, or (ii.) any maintenance or repair service on any of the products produced or sold by Manufacturer.
Id. ¶ 8.2.

   [4] There is evidence in the record suggesting Burnett initially purchased an extended warranty, but cancelled same in March 2011. See Murphy Decl., Ex. 19, ECF No. 37-20.

window was not aligned properly. She also discovered water damage on the inside passenger-side wall in the front of the RV, near the passenger window. She brought the RV back to the Flagg dealership for repairs at least three times between January and April 2006. In January Flagg performed work on the window on the driver's side. This window was jammed, and Flagg staff loosened and reset the window frame. In February Flagg adjusted the rubber seal around the driver's door. On April 6, 2006, Flagg repaired the water-damaged wall panel and resealed the passenger window. The RV had 2100 miles on the odometer at that time. In October 2006 plaintiff noticed leakage around the windshield on the passenger side and brought the RV to two separate vendors in Syracuse, New York, where the windshield was repaired and/or resealed.

Plaintiff next observed a leak around the driver's window in December 2006. At that time the RV had sat at her sister's home in Virginia for a period of time, and mold and mushrooms had formed on the driver's-side floor. She dug out the mushrooms with a knife and removed the mold by scrubbing the carpet with bleach. She kept some of the mushrooms, which she showed to Flagg employees when she brought the RV back to the Florida dealership in early 2007. At that time, Flagg performed a "Sealtech" inspection and found extensive leaks in the RV. However, plaintiff did not request, and Flagg did not perform, any repairs at that time. Burnett claims water continued to leak into various areas of the RV thereafter, and mold again grew inside the passenger compartment. She again attempted to remove the mold herself using various methods in 2009 and 2010.

Between 2006 and 2010 Burnett resided in upstate New York during the summer and in Florida during the winter. As such, she slept in the RV in Florida during the winter months—typically November through April. In May 2010 a routine CAT scan revealed a

mass in her left lung.[5] In July 2010 she underwent surgery to remove the mass. This procedure was performed by Dr. Suhas V. Pradhan, M.D. ("Dr. Pradhan"), a thoracic surgeon at the Veterans Affairs Medical Center in Syracuse. Upon completion of the surgery, and after consulting with pathology, Dr. Pradhan diagnosed plaintiff with aspergilloma caused by inhalation of aspergillus mold.

Burnett retained four experts. In July 2010 CRAL Contracting, Inc. ("CRAL") examined the RV and issued a report on August 5, 2010. Murphy Decl., Ex. 22, ECF No. 37-23, 46–72.[6] CRAL noted visible mold in the front of the RV and found aspergillus/penicillium in the air inside the RV at a concentration sixteen times higher than that of ambient air. A second examination was conducted in August 2012 by Matthew DaRin, an indoor environmental hygienist with Bluepoint Environmental, LLC ("DaRin"), who issued a report on September 19, 2012. DaRin Aff., Ex. B, ECF No. 55-2. DaRin observed mold, mushroom growth, and water damage in the front of the vehicle on the passenger side and near the "slide-out" behind the driver's seat. He claimed that this damage was indicative of chronic and long-term moisture intrusion. He further noted that over forty percent (40%) of the living space inside the RV was contaminated with mold, and he measured higher concentrations of mold in the air inside the RV than in outdoor air. He faulted the design of the RV and Thor's allegedly inadequate rain booth testing.

Professional engineer Eugene Camerota ("Camerota") completed an investigation, which included three inspections of the RV between July 2011 and August 2012, and issued

---

[5] Burnett smoked three packs of cigarettes per day from 1971 through 1990 and underwent routine CAT scans due to a family history of cancer.

[6] The pagination corresponds to the page numbers as assigned on CM/ECF. This convention will be used throughout the order for citations to specific pages of exhibits.

a report on September 20, 2012. Camerota Aff., Ex. A, ECF No. 57-1. He noted carpet discoloration and/or mushroom growth near the slide-out behind the driver's seat, on the floor near the bottom of the driver's door, below the passenger-side window, and on the floor under the dashboard on the passenger side. He reported that the extensive damage suggests water had been leaking into the RV "for a considerable time prior to Burnett taking delivery of the motor coach." Id. 9. He concluded that manufacturing flaws caused the leaks, and he faulted Thor's testing process for failing to discover the leaks prior to delivery to the dealership. Specifically, he claims the rain booth test should have been conducted on the empty shell of the RV, not after all the fixtures had been installed, to allow for easy identification of leaks.

A fourth report was issued on September 24, 2012, by Dr. William Sawyer of Toxicology Consultants & Assessment Specialists, LLC ("Dr. Sawyer"). Murphy Decl., Ex. 22, ECF No. 37-23, 77–90 ("Dr. Sawyer Report"). Dr. Sawyer noted that the levels of aspergillus found by CRAL in the RV "are in the extreme upper range of any values ever reported in the literature for living quarter environments." Id. 87. He opined that Burnett was "exposed to hazardous levels of toxic molds" in the RV, which is consistent with her diagnosis of aspergilloma. Id. 90.

Thor has also retained and identified four experts, including Dr. Hung K. Cheung, M.D., an environmental and occupational medicine specialist ("Dr. Cheung"), and Dr. Michael Larranaga, Ph.D., a professional engineer ("Dr. Larranaga"). Dr. Cheung found plaintiff's experts' opinions to be unreliable and concluded that her "medical conditions were not causally related to any alleged exposure to mold" in the RV. Cheung Decl., ¶ 7, ECF No. 37-31. Dr. Cheung further opined that there is a lack of medical evidence to support a diagnosis

of aspergilloma. Dr. Larranaga inspected the RV in October 2011 and performed a peer review of plaintiff's experts' reports. Larranaga Decl., Ex. 2, ECF No. 37-46. He criticized their opinions and methodology, and specifically faulted their failure to consider alternative sources of exposure to aspergillus.

Thor also relies on the examinations and testimony of Thomas Bailey ("Bailey") and Thomas Fribley ("Fribley"). Bailey conducted an infrared thermography investigation of the RV on October 6, 2011. He noted mold growth on the driver's side "slide out" and near the windshield on the passenger's side. However, he reported that these areas were not moist despite a recent rainfall and concluded that "[t]he area above and below the passenger side front window that was sealed by Flagship RV in April of 2006 showed no mold or water intrusion." Baase Decl., Ex. Q-6, ECF No. 39-25, 18.

Fribley also inspected the RV on October 6, 2011. He observed heavy mold growth in the front corner of the slide out and on the passenger side near the windshield. He concluded that there was no manufacturing defect by Thor nor any negligent repair work by Flagg. Baase Decl., Ex. Q-7, ECF No. 39-26, 7. Bailey and Fribley instead suggest that the water leakage and mold growth was caused by the natural deterioration of the seals and rubber moldings on the RV, and plaintiff's failure to properly maintain same as directed in the owner's manual.

Although it is undisputed that the RV sustained water damage and contained mold during the relevant time period, the parties vigorously dispute the cause of the water intrusion and subsequent mold growth. They also dispute whether plaintiff's lung condition was caused by the mold in the RV and whether the mold found in the RV is of the same type that could have caused such an injury. Burnett has been unable to use the RV since 2011, and it

currently sits in storage in Syracuse, New York, at her expense. Flagg went out of business in 2011.

## III. **DISCUSSION**

### A. **Motion for Summary Judgment—Legal Standard**

Thor and Flagg have each moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. The entry of summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (citing FED. R. CIV. P. 56(c)); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248; see also Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

When summary judgment is sought, the moving party bears the initial burden of demonstrating that there is no genuine issue of material fact to be decided with respect to any essential element of the claim. Id. at 250 n.4. The failure to meet this burden warrants denial of the motion. Id. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Id. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party. Jeffreys, 426 F.3d at 553. Summary judgment is inappropriate where "review of the record

reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor."

Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted); see also

Anderson, 477 U.S. at 250 (summary judgment is appropriate only when "there can be but

one reasonable conclusion as to the verdict").

### B. **Thor's Motion to Preclude Experts and for Summary Judgment**

Thor maintains that three of Burnett's experts—CRAL, Dr. Sawyer, and DaRin—used

improper methodology and relied on incomplete data and, therefore, their reports should be

stricken and their testimony precluded from trial.  In turn, Thor argues it is entitled to

summary judgment on plaintiff's three state law claims because, without these experts'

reports and testimony, she cannot establish that her lung condition was caused by exposure

to the mold in the RV.

In the alternative, Thor asserts it is entitled to summary judgment on the strict liability

and failure to warn claims because the owner's manual specifically warned of mold and

mildew, Burnett previously owned motor homes and knew of such risks, and any failure to

warn was not a proximate cause of her injury.  Finally, Thor argues that the "economic loss

doctrine" bars any damages for the loss of economic value of the RV.

### 1. **Plaintiff's Experts**

In order to ultimately succeed on her claim that the mold in the RV caused her medical

condition, Burnett must establish both general and specific causation.  More specifically, she

"must offer admissible expert testimony regarding both general causation, i.e., that [mold]

exposure can cause the type of ailments from which [Burnett] claims to suffer; and specific

causation, i.e., that [mold] exposure actually caused [her] alleged . . . problems."

Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 268 (2d Cir. 2002).  Thor maintains

that plaintiff cannot establish either causation without the opinions and findings of CRAL, DaRin, and Dr. Sawyer, which Thor argues are unreliable because their methodology and data are flawed.

Federal Rule of Evidence 702 affords expert witnesses "wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592 (1993). It is well-established that "[u]nder Daubert, the district court functions as the gatekeeper for expert testimony whether proffered at trial or in connection with a motion for summary judgment." Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 311 (2d Cir. 2008) (internal quotation marks and citation omitted). Such testimony must be relevant and reliable, and is properly excluded if it is "speculative or conjectural." Id. (internal quotation marks omitted).

Before deeming an expert's testimony sufficiently reliable, a court must ensure: "(1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case." Amorgianos, 303 F.3d at 265 (internal quotation marks omitted) (citing FED. R. EVID. 702). This inquiry is "flexible," and a district court "enjoy[s] considerable discretion in deciding on the admissibility of expert testimony." United States v. Farhane, 634 F.3d 127, 158 (2d Cir.) (internal quotation marks and citation omitted), cert. denied, Sabir v. United States, 132 S. Ct. 833 (2011).

In seeking to preclude the reports and testimony of plaintiff's experts, Thor specifically argues that: (1) CRAL only collected relevant air samples in the RV on one occasion, in July 2010; (2) the sample collected by DaRin in August 2012 does not accurately reflect the air quality in the RV when plaintiff was exposed between 2006–2010; (3) Dr. Sawyer did not

conduct any independent testing and only relied on CRAL's and DaRin's data[4]; (4) according to two of Thor's experts, there is currently no reliable method to determine the level of airborne toxins in an indoor environment; (5) plaintiff's medical records do not support a diagnosis of aspergilloma; and (6) these experts cannot establish a causal link between the mold in the RV and plaintiff's lung mass because they do not rule out other potential causes such as her family history of cancer, her years of smoking, and her exposure to dogs, outdoor environmental conditions, and bacteria during prior hospitalizations.

At the outset, the cases upon which Thor relies to challenge the air sampling methodology employed by plaintiff's experts are non-binding and distinguishable. See Cubas v. Clifton & Classon Apt. Corp., 82 A.D.3d 695, 696 (N.Y. App. Div. 2d Dep't 2011) (plaintiff's experts failed to utilize objective standards to show general or specific causation); Jagger v. Katz Park Ave. Corp., 33 Misc.3d 139(A) (N.Y. App. Div. 1st Dep't 2011) (unpublished decision faulting plaintiff's expert for relying on air samples taken on a single day); Fraser v. 301-52 Townhouse Corp., 13 Misc.3d 1217(A) (N.Y. Sup. Ct. 2006) (unpublished opinion of the Supreme Court, New York County, concluding that plaintiff's expert failed to identify scientific literature to support a finding of general causation between indoor mold and health problems).[5] Importantly, these New York state courts applied the Frye standard, not the

_____

[4] Thor also claims that Dr. Sawyer's expert opinion and testimony has been disqualified or discredited in five prior cases in federal district courts due to faulty causation analysis. However, this has no bearing on the admissibility and reliability of his opinion and testimony in this case. Moreover, Dr. Sawyer notes that the admissibility of his expert opinion has been challenged over 100 times in federal and state courts, under both Daubert and Frye standards. Sawyer Aff. ¶ 9, ECF No. 56.

[5] With regard to the Fraser case, Thor only quotes and cites to the Supreme Court, New York County, order. This order was eventually affirmed by the Appellate Division, First Department, which specifically clarified: "We stress that our holding does not set forth any general rule that dampness and mold can never be considered the cause of a disease, only that such causation has not been demonstrated by the evidence presented by plaintiffs here." Fraser v. 301-52 Townhouse Corp., 57 A.D.3d 416, 418 (N.Y. App.

(continued...)

more liberal <u>Daubert</u> standard.

Further, Burnett's experts identify various data and scientific literature supporting a finding of general causation. <u>See, e.g.</u>, Dr. Sawyer Report 83–84 nn. 8–13. Dr. Sawyer's opinion regarding specific causation is also adequately reliable and is not based solely on one air sample as Thor alleges. Unlike the experts in the cases cited by Thor, Dr. Sawyer detailed the quantitative standards and guidelines for viable fungi/mold in the air, as recommended by several professional groups. <u>Id</u>. 87–88. He then compared these standards to the evidence in the record and concluded that the levels of toxic mold in the RV created "classic 'worse case' conditions for inhalation of toxic mold spores." <u>Id</u>. 90.

Next, plaintiff's experts do not simply rely on CRAL's single air sample test. As noted in their respective reports, they also base their opinions on multiple personal inspections of the RV; physical evidence, measurements, and photographs of mold in the RV; DaRin's August 2012 air sample; plaintiff's deposition testimony regarding her repeated efforts to remove the mold and mushrooms over a period of years; the history of leaks involving Thor motor homes; documents regarding repairs of the RV's leaks; reports confirming the presence of aspergillus in the RV; her medical records and treating physician's diagnosis; and the experts' training, experience, and professional research.

The remainder of Thor's objections to these experts impact the weight to be afforded their opinions, not the admissibility of their reports and testimony. The fact that DaRin's air sample was collected in 2012 does not necessarily render it irrelevant or inadmissible. It is reasonable to infer that the mold documented by DaRin in August 2012 is of the same type

---

[5](...continued)
Div. 1st Dep't 2008).

that was repeatedly observed in the RV between 2006 and 2010 when plaintiff was exposed. Similarly, that Dr. Sawyer did not conduct independent testing speaks to the credibility of his conclusions, not the admissibility of his report. Further, Thor's assertion that the medical records do not support a diagnosis of aspergilloma is belied by the testimony of Burnett's treating thoracic surgeon, Dr. Pradhan, who noted that "[t]he diagnosis was based on her medical records, pathology reports and the opinion, knowledge and experience of the physicians involved in diagnosing Ms. Burnett." Pradhan Aff. ¶ 3, ECF No. 54.

Finally, Thor argues that these experts failed to consider other potential causes of Burnett's medical condition. This argument is unpersuasive. Neither CRAL nor DaRin even opined on the specific medical causation of plaintiff's condition; they documented the air quality and physical condition of the RV. Plaintiff instead relies on Dr. Sawyer's analysis and opinion to establish specific causation. As explained above, his analysis and opinions are sufficiently supported by scientific data and evidence in the record. Before concluding that plaintiff's exposure to the levels of toxic mold in the RV is consistent with her diagnosis of aspergilloma, Dr. Sawyer detailed her pertinent medical history, weakened immune system, her family's medical history, and her history of hospitalizations and cigarette smoking. See Dr. Sawyer Report 81–83. He also noted that aspergillus grows on organic debris and occurs naturally in some outdoor and hospital environments. Id. 83–86. It is reasonable to infer that Dr. Sawyer took into account, and ultimately ruled out, these possible factors before concluding that the high levels of aspergillus, penicillium, and stachybotrys found in the RV caused her medical condition.

In short, the conclusions offered by Burnett's experts could reliably follow from the data known to them at the time and the methodology they employed. This is sufficient to

establish admissibility under the <u>Daubert</u> standard.  <u>See</u> <u>Amorgianos</u>, 303 F.3d at 266–67.

Thor may subject these experts to rigorous cross-examination to highlight any flaws in their

methodology and reasoning, but their opinions, reports, and testimony are admissible.

Accordingly, Thor's motion to preclude the reports and testimony of CRAL, DaRin, and Dr.

Sawyer will be denied.  In turn, its motion for summary judgment on the merits of the claims

will also be denied to the extent it rests on the preclusion of the expert reports and testimony.

These three experts, coupled with Camerota's report and Dr. Pradhan's opinions, establish

issues of material fact as to whether the water intrusion into the RV was caused by design or

manufacturing defects and whether the mold discovered in the RV led to plaintiff's lung

condition.

## 2. <u>Strict Products Liability and Failure to Warn</u>

Thor next asserts that Burnett's strict products liability and failure to warn claims fail

because the owner's manual specifically warned of mold and mildew.  Alternatively, Thor

argues that Burnett previously owned motor homes and knew of the risks associated with

water intrusion into such vehicles.

Under New York law, a plaintiff asserting a strict products liability claim must show that

the defendant produced a product that was not reasonably safe for its intended use, that she

was injured while using the defective product in its intended manner, that the product's defect

was the proximate cause of her injury, and that she could not have discovered the defect and

perceived its danger by exercising reasonable care.  <u>Caronia v. Philip Morris USA, Inc.</u>, 715

F.3d 417, 428 (2d Cir. 2013); <u>Monell v. Scooter Store, Ltd.</u>, 895 F. Supp. 2d 398, 411

(N.D.N.Y. 2012) (D'Agostino, J.).  The manufacturer may be held liable under strict products

liability based on improper design, manufacturing flaws, or a failure to warn.  <u>Monell</u>, 895 F.

Supp. 2d at 411.  Burnett alleges all three theories.  As noted above, issues of material fact exist regarding whether the design and/or manufacture of the RV caused her medical condition.  Therefore, this portion of Thor's motion only implicates the alleged failure to warn.

To succeed on her failure to warn claim, Burnett must establish that:  (1) Thor had a duty to warn, i.e., it knew or should have known of latent dangers resulting from intended uses of the RV; (2) she used the RV in a reasonably foreseeable manner; and (3) Thor's failure to provide adequate warnings was a proximate cause of her harm.  See id. at 413.  "A defense to liability for failure to warn exists when the injured party had actual knowledge of the danger."  Henry v. Rehab Plus Inc., 404 F. Supp. 2d 435, 442 (E.D.N.Y. 2005).

As this standard often involves a fact-intensive inquiry, courts have been cautioned that "[t]he adequacy of the instruction or warning is generally a question of fact to be determined at trial and is not ordinarily susceptible to the drastic remedy of summary judgment."  Urena v. Biro Mfg. Co., 114 F.3d 359, 366 (2d Cir. 1997).  Nonetheless, a failure to warn claim may be decided as a matter of law where the plaintiff was fully aware of the risks "through general knowledge, observation or common sense" or where the hazards were patently dangerous or open and obvious.  Monell, 895 F. Supp. 2d at 414.

During her deposition, Burnett acknowledged that she has owned motor homes in the past and was aware of the need to regularly inspect the caulking and seals around the lights and windows.  The owner's manual, which Burnett acknowledges receiving when she purchased the RV, recommends inspecting and resealing the seals every six months.  It further cautions:

> It is the responsibility of the owner to take such preventive measures as are necessary to maintain the exterior caulking and sealer of the RV.  It is the responsibility of the owner to use reasonable prudent, care to prevent

> foreseeable secondary damage from rainwater, plumbing leaks, condensation, and the natural accumulation of moisture in the RV, such as delaminated floor; stained upholstery, carpeting, or drapes; mold formation and growth; furniture damage, etc. Mold and mildew are natural growths given certain environmental conditions and are not covered by the terms and conditions of this Limited Warranty.

Murphy Decl., Ex. 20, ECF No. 37-21, 12.

Based on her experience, and perhaps partly influenced by the recommendations in the owner's manual, Burnett did inspect and care for the RV's seals to some extent. She claims that the seals were inspected and/or repaired by Flagg employees during service appointments and by technicians at "Meyers RV" and "JT Glass" in Syracuse. Murphy Decl., Ex. 11, ECF No. 37-12, 45:6–15, 46:1–10. She personally inspected the seals on the slide-out part of the RV and "sprayed them regularly with the rubber seal stuff." Id. 46:23–25. She cannot now claim to have been unaware of the need to inspect and maintain the seals. Nor can she seriously contend that Thor failed to warn of the possibility of mold growth as a result of water intrusion. Indeed, the owner's manual specifically warns that the failure to maintain the seals and caulking can result in mold and mildew growth.

Further, the fact that mold can have harmful effects on a person's health is obvious and bourne out of general knowledge and common sense. It is therefore immaterial that Thor did not include notice of the specific health risks associated with specific types of mold. Even if such a notice had been included in the owner's manual, there is nothing in the record to suggest Burnett would have read and heeded it. When asked whether she ever looked at the "Seals and Adhesives" section of the manual, she replied: "I never did because I had always owned an RV and knew what to do." Id. 47:3–6. She therefore cannot establish that Thor's failure to warn of the specific health risks of mold growth inside the RV was a

proximate cause of her injury.  See Reis v. Volvo Cars of N. Am., Inc., 73 A.D.3d 420, 423 (N.Y. App. Div. 1st Dep't 2010) (plaintiff did not read the owner's manual "because he understood how cars operated" and could thus not show that any failure to include a pertinent warning in the manual was a substantial factor in bringing about his injury).

Accordingly, Thor's motion for summary judgment will be granted with respect to the failure to warn claim.  The strict products liability claim will be limited to the theories of design and/or manufacture defect.

### 3. Economic Loss Doctrine

Finally, Thor argues that Burnett's entitlement to monetary compensation for damage to or the loss of the RV is guided by the limited warranty, which undisputedly expired in December 2006.  In response, plaintiff simply notes that she has not brought a breach of contract or warranty claim.

New York's "economic loss doctrine" provides that a purchaser cannot recover in tort against a manufacturer for monetary harm to a product caused by a defect in the product itself.  Wade v. Tiffin Motorhomes, Inc., 686 F. Supp. 2d 174, 187 (N.D.N.Y. 2009) (Suddaby, J.).  The purchaser's only available remedy for such economic loss is in contract (i.e. warranty), not in tort under strict products liability or negligence.  Id.  "The rule is applicable to economic losses to the product itself as well as consequential damages resulting from the defect."  Bristol Vill., Inc. v. La.–Pac. Corp., 916 F. Supp. 2d 357, 365 (W.D.N.Y. 2013) (internal quotation marks omitted).  In contrast, tort recovery is permitted for personal injuries and for damage to "other property" caused by the defective product.  Id.

"Critical to a determination of whether a tort claim is barred by the economic loss doctrine is whether damages are sought for the failure of the product to perform its intended

purpose, in which case recovery is barred by the economic loss doctrine, or for direct and consequential damages caused by a defective and unsafe product." Praxair, Inc. v. Gen. Insulation Co., 611 F. Supp. 2d 318, 326 (W.D.N.Y. 2009).

Whether Burnett can seek monetary damages in tort for the loss in economic value of the RV hinges on whether the damage thereto relates to the failure of the RV to perform its intended purpose. Thor is correct that plaintiff's tort claims for money damages related to the physical damage to the RV are barred. Indeed, in cases involving the failure of exterior building products to perform properly, New York state courts have held that "the economic loss rule bars recovery for both the direct loss of the product itself as well as the consequential damages to the underlying structure." See Bristol Vill., Inc., 916 F. Supp. 2d at 366 (collecting cases involving leaking roofs).

In short, plaintiff alleges that defects in the design and/or manufacture of the RV prevented it from performing its intended purpose of keeping water out, ultimately causing physical damage to and a decrease in value of the vehicle. Her only remedy for such economic loss is in contract and warranty. However, she brings neither a breach of contract nor a breach of warranty claim. Therefore, Thor's motion for summary judgment will be granted with respect to plaintiff's claims for monetary damages related to the physical damage to the RV and the economic loss caused thereby. Plaintiff may still seek damages for her personal injuries, medical expenses, and damage to any "other property."

### C. Flagg's Motion for Summary Judgment

Flagg argues that it is entitled to summary judgment with respect to Thor's second

amended third-party complaint because:  (1) personal jurisdiction over Flagg is lacking[6]; (2) Flagg was not negligent; and (3) Thor agreed to indemnify Flagg.

### 1. Personal Jurisdiction

Flagg and Thor dispute whether personal jurisdiction can be established over Flagg pursuant to either New York Civil Practice Law and Rules ("CPLR") 301 (general jurisdiction) or 302 (long-arm statute).

To determine whether personal jurisdiction exists over a non-domiciliary, a federal district court must apply the law of the forum state.  See Chloe v. Queen Bee of Beverly Hills, LLC, 616 F.3d 158, 163 (2d Cir. 2010).  If state law permits personal jurisdiction, the court must then determine whether the exercise of such jurisdiction comports with traditional notions of due process.  Id. at 164.  This due process analysis incorporates two inquiries:  (1) whether the defendant had "sufficient contacts with the forum state to justify the court's exercise of personal jurisdiction"; and (2) whether it is reasonable to exercise jurisdiction in light of the particular circumstances of the case.  Id.  When considering the reasonableness aspect, a court may evaluate the burden on the defendant, the interests of the forum state, the plaintiff's interest in obtaining relief, interstate judicial economy, and the shared interest of "furthering fundamental substantive social policies."  Id.

CPLR 301 allows for the exercise of personal jurisdiction over a foreign corporation "if it has engaged in such a continuous and systematic course of doing business here that a finding of its presence in this jurisdiction is warranted."  Landoil Res. Corp. v. Alexander &

---

[6]  Flagg made this same jurisdictional challenge at the motion to dismiss stage.  That motion was denied from the bench on December 9, 2011, without prejudice to be renewed after discovery.  See ECF No. 22.

Alexander Servs., Inc., 77 N.Y.2d 28, 33 (1990) (internal quotation marks omitted).  The essential factual inquiry is whether the corporation has a permanent and continuous presence in the state, as opposed to merely occasional or casual contact.  Id. at 33–34.  When making such a determination, a court should consider the following factors:  "the existence of an office in New York; the solicitation of business in the state; the presence of bank accounts and other property in the state; and the presence of employees of the foreign defendant in the state."  Hoffritz for Cutlery, Inc. v. Amajac, Ltd., 763 F.2d 55, 58 (2d Cir. 1985).

It is undisputed that Flagg does not maintain an office or have any property, bank accounts, or employees in New York.  Thor instead seeks to establish general jurisdiction via the company's interactive website and the volume of its sales to New York residents.  However, there is no evidence in the record from which to infer that Flagg's website was interactive, as opposed to passive.  During her deposition, Lori Flagg could not recall receiving any emails or website communications from New York residents.  Nor has Thor made a sufficient showing of additional solicitation to establish Flagg's "permanent and continuous presence" in the state for purposes of CPLR 301.  See Thomas Publ'g Co. v. Indus. Quick Search, Inc., 237 F. Supp. 2d 489, 491 (S.D.N.Y. 2002) (requiring "additional commercial activity" aimed at New York, not merely an interactive website, to justify exercising jurisdiction under CPLR 301).

Jurisdiction over Flagg is more appropriately based on New York's long-arm statute, which permits the exercise of personal jurisdiction over any non-domiciliary defendant if the following elements can be established:  (1) the defendant committed a tortious act outside New York; (2) the cause of action arises from that act; (3) the act caused injury to a person or

property within the state; (4) the defendant expected or should reasonably have expected the act to have consequences in the State; and (5) the defendant derived substantial revenue from interstate or international commerce.  N.Y. C.P.L.R. 302(a)(3)(ii); LaMarca v. Pak-Mor Mfg. Co., 95 N.Y.2d 210, 214 (2000).

The first three elements are met based on Thor's allegations that Flagg negligently inspected and/or repaired the RV in Florida, which allegedly caused Burnett's injury in New York.  Flagg contends it was not foreseeable that any negligence on the part of its employees in Florida would cause injury to a person or property in New York.  This argument is unpersuasive.  During her deposition, Lori Flagg acknowledged that a portion of Flagg's customers were New York residents who spent their winters in Florida.  Flagg sold the RV to Burnett, a New York resident, and cannot seriously argue it did not expect her to drive the vehicle from Florida back to her home in New York.  Further, Burnett's New York residence was clearly indicated on the documents related to the purchase and subsequent repairs of the RV.  Flagg thus had reason to expect that any negligence on its part could result in direct consequences in New York.  See LaMarca, 95 N.Y.2d at 215 (Texas manufacturer should have expected any defect in its garbage truck to have consequences in New York as the purchase invoice indicated the truck was bound for New York).

Moreover, Flagg acknowledges that, between 2001 and 2011, approximately twenty percent (20%) of its sales and thirty-two percent (32%) of its service orders involved non-Florida residents.  Thor points to evidence in the record indicating Flagg sold motor homes to over fifty New York residents and had a customer base in forty-six states, Puerto Rico, Canada, and the United Kingdom.  Therefore, Flagg derived substantial revenue from interstate and international commerce.  See Justus v. Toyo Kensetsu Kohki Co., 228 F.

Supp. 2d 215, 221 (N.D.N.Y. 2002) (Scullin, C.J.).

Finally, exercising personal jurisdiction over Flagg does not offend traditional notions of due process. Although Flagg's contacts with New York are relatively minimal, they are sufficient to justify the minimum contacts required for CPLR 302(a)(3)(ii). As noted above, it was reasonably foreseeable that any tortious conduct by its employees would have consequences in New York. Further, while the only New York resident in this action, Burnett, may obtain relief from Thor regardless of whether Flagg remains as a third-party defendant, interstate judicial economy counsels in favor of resolving all related matters in one action.

Therefore, although general jurisdiction is arguably lacking under CPLR 301, there is sufficient evidence in the record to establish long-arm jurisdiction over Flagg pursuant CPLR 302(a)(3)(ii). Its motion for summary judgment based on a lack of personal jurisdiction will thus be denied.

### 2. **Flagg's Alleged Negligence**

Flagg maintains it cannot possibly be found negligent because Thor's experts agree that its employees properly repaired the leak on the passenger side of the RV and that the leaks which ultimately caused the mold were around the windshield and the slide-out portion of the vehicle. However, warranty paperwork indicates Flagg employees performed repairs on the driver's-side window area of the RV in January and February 2006, an area where water damage was later allegedly found. Thor also alleges that, despite Burnett's continued complaints that various areas of the RV were leaking, Flagg failed to identify and fix leaks that reasonable inspections would have revealed.

In short, issues of material fact exist as to whether Flagg was negligent in failing to identify and repair leaks in the RV, and whether such negligence caused mold formation and

led to Burnett's medical condition.  Accordingly, Flagg's motion for summary judgment will be denied as it relates to Thor's negligence claim.

### 3.  **Indemnification**

Finally, Flagg argues that it is entitled to summary judgment on its counterclaim for indemnification against Thor because, as a matter of law, it was not negligent.  However, the Indemnification by Manufacturer clause in the Dealer Agreement states that Thor will indemnify Flagg for any damages caused by design and/or manufacturing defects, so long as such defects could not have been discovered by Flagg during a reasonable pre-delivery inspection.  Likewise, the Indemnification by Dealer clause notes that Flagg will indemnify Thor for any harm caused by negligence on the part of its employees while performing repair services.

As noted above, issues of material fact remain as to whether Burnett's medical condition was caused by the mold growth in the RV and whether that mold growth was caused by manufacturing and/or design defects by Thor or by negligence on the part of Thor and/or Flagg.  Therefore, any determination of which entity shall indemnify the other is premature.

## IV.  **CONCLUSION**

The reports and testimony of Burnett's experts are admissible under Daubert.  These experts, coupled with the other evidence in the record, establish numerous issues of material fact for trial.  Such issues include, but are not limited to, whether any design and/or manufacturing defects by Thor led to the water intrusion into the RV; whether Thor was negligent in the design, manufacture, or inspection of the RV prior to delivery to Flagg's dealership; whether Flagg was negligent in failing to identify and/or repair the leaks in the

RV; and whether the leaks and subsequent mold growth caused plaintiff's medical condition. The issue of whether Thor should indemnify Flagg, or vice versa, is dependent upon how the jury ultimately resolves these issues of material fact.  Finally, the economic loss doctrine bars Burnett from seeking money damages for the loss in value of the RV, but she may seek damages related to her personal injuries, medical expenses, and damage to "other property."

Therefore, it is

ORDERED that

1.  Defendant Thor's motion for summary judgment is GRANTED in part and DENIED in part;

2.  Defendant Thor's motion to preclude plaintiff's experts is DENIED;

3.  Plaintiff's failure to warn claims against defendant Thor are DISMISSED;

4.  Plaintiff is barred from seeking money damages related to the loss in economic value of the RV itself;

5.  Defendant Thor's motion for summary judgment on plaintiff's strict products liability claim (based on the theories of design and manufacturing defect only) and the negligence claim is DENIED and these claims remain for trial;

6.  Third-party defendant Flagg's motion for summary judgment is DENIED; and

7.  Third-party plaintiff Thor's negligence and indemnification/contribution claims against Flagg, and Flagg's indemnification counterclaim against Thor, remain for trial.

IT IS SO ORDERED.

_____
United States District Judge

Dated:  December 2, 2013
      Utica, New York.

     The trial will commence with jury selection at 9:30 a.m. on March 3, 2014, in Utica, New York.  Pretrial submissions shall be filed on or before February 17, 2014, at noon.  The parties shall arrange for a settlement conference before Magistrate Judge David E. Peebles.  The conference shall be conducted on or before January 24, 2014.